PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

MORGAN KEEGAN & COMPANY,
INC.,

*Plaintiff-Appellee,*

v.

LOUISE SILVERMAN; LOUISE
SILVERMAN TRUST; MAX SILVERMAN,

*Defendants-Appellants.*

No. 12-1208

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
J. Frederick Motz, Senior District Judge.
(8:11-cv-02533-JFM)

Argued: December 4, 2012

Decided: February 4, 2013

Before NIEMEYER, KEENAN, and DIAZ, Circuit Judges.

Affirmed by published opinion. Judge Keenan wrote the opinion, in which Judge Niemeyer and Judge Diaz joined.

## COUNSEL

**ARGUED:** Adam J. Gana, NAPOLI BERN RIPKA SHKOL-NIK LLP, New York, New York, for Appellants. George C. Freeman, III, BARRASSO, USDIN, KUPPERMAN, FREE-

MAN & SARVER, LLC, New Orleans, Louisiana, for Appellee. **ON BRIEF:** Thomas C. Costello, COSTELLO LAW GROUP, Baltimore, Maryland, for Appellants. Priscilla A. Donovan, DONOVAN AND RAINIE LLC, Baltimore, Maryland; Larry E. Mobley, David N. Luder, BARRASSO, USDIN, KUPPERMAN, FREEMAN & SARVER, LLC, New Orleans, Louisiana, for Appellee.

**OPINION**

BARBARA MILANO KEENAN, Circuit Judge:

In this case, we consider whether the district court erred in holding that Morgan Keegan & Company, Inc. (Morgan Keegan), a member of the Financial Industry Regulatory Authority (FINRA), is not subject to FINRA arbitration proceedings initiated by Louise Silverman, Max Silverman, and the Louise Silverman Trust (collectively, the defendants). In their FINRA arbitration claim, the defendants asserted that Morgan Keegan engaged in misconduct relating to the valuation and marketing of certain bond funds purchased by the defendants through their brokerage firm, Legg Mason Investor Services, LLC (Legg Mason).[1]

Morgan Keegan filed an action in the district court seeking to enjoin the arbitration proceedings on the ground that under the controlling FINRA Rule, the defendants were not "customers" of Morgan Keegan entitled to compel arbitration of their dispute. The district court agreed with Morgan Keegan's position, permanently enjoining the arbitration proceedings. Upon our review, we affirm the district court's judgment because the defendants were not "customers" of Morgan Keegan, within the meaning of the disputed FINRA Rule, and,

---

[1]Legg Mason is also a FINRA member. *See* FINRA, List of Members, *http://www.finra.org/AboutFINRA/MemberFirms/ListOf Members/ P012923*.

therefore, were not entitled to invoke the mandatory arbitration provision contained in that Rule.

## I.

### A.

FINRA is a registered, self-regulatory organization authorized under the Securities Exchange Act of 1934.[2] *See* 15 U.S.C. §§ 78c(a)(26), 78s(b). FINRA has the authority to create and enforce rules for its members to provide "regulatory oversight of all securities firms that do business with the public." Securities and Exchange Commission Release No. 34-56145, 72 Fed. Reg. 42169, 42170 (July 26, 2007). At issue in this appeal is the portion of the FINRA Rules, known as the "Customer Code," which establishes the conditions for an arbitration proceeding between FINRA "members" and their "customers" before a FINRA arbitration panel (FINRA arbitration).[3] The Code of Arbitration Procedure contained in the FINRA Rules (the FINRA Code or the Code) provides in Rule 12200 that parties must arbitrate a dispute if the following conditions are met:

- Arbitration under the Code is either:

    (1) Required by written agreement, or

---

[2]FINRA was created in 2007 by a consolidation of the National Association of Securities Dealers, Inc. (NASD) and the regulatory arm of the New York Stock Exchange Regulatory, Inc. Securities and Exchange Commission Release No. 34-56145, 72 Fed. Reg. 42169, 42170 (July 26, 2007).

[3]The FINRA Rules include distinct subparts: the "Industry Code," which governs "arbitrations between or among industry parties only," and the "Customer Code," applicable in this case, which governs arbitrations between "investors and brokers and/or brokerage firms." *See* FINRA, Arbitration & Mediation, Code of Arbitration Procedure, http://www.finra.org/arbitrationandmediation/arbitration/rules/codeof arbitrationprocedure/.

(2) Requested by the customer;

- The dispute is between a customer and a member or associated person of a member; and

- The dispute arises in connection with the business activities of the member or the associated person, except disputes involving the insurance business activities of a member that is also an insurance company.

Thus, in the absence of a separate arbitration agreement, a party can compel a FINRA member to participate in FINRA arbitration if: (1) the party is a "customer" of the FINRA member; and (2) there is a dispute between the "customer" and the FINRA member, or the member's associated person, arising in connection with the business activities of the FINRA member or a member's associated person.

B.

Morgan Keegan, a member of FINRA, engages in business services that include the brokerage and dealing of securities, as well as providing investment advice. Morgan Keegan was the principal distributor and underwriter of certain bond funds, known as the Regions Morgan Keegan Funds (the funds), which were traded on the New York Stock Exchange.

The defendants did not invest in the funds during their initial public offering, which occurred before the end of 2006. Instead, in 2007, the defendants purchased shares of the funds from a third party, through the defendants' securities broker at Legg Mason, a firm unaffiliated with Morgan Keegan.

In late 2007, the defendants suffered financial losses when the value of the funds dropped dramatically. The defendants asserted that their losses resulted, in part, because Morgan Keegan failed to disclose critical information about the high-

risk nature of the funds and falsely inflated the funds' asset values. To resolve this claim and other related claims, the defendants initiated FINRA arbitration proceedings against Morgan Keegan, asserting that they were entitled to do so under Rule 12200 as "customers" of Morgan Keegan.[4]

Although the defendants acknowledged that they never held a brokerage account with Morgan Keegan, they nonetheless claimed a customer relationship with Morgan Keegan as a result of their brokerage dealings with Legg Mason, another FINRA member. The defendants contended that employees of Morgan Keegan encouraged the Legg Mason broker to purchase the funds and that, in executing these purchases, the Legg Mason broker relied on Morgan Keegan's marketing materials describing the funds. The defendants, however, did not receive or review personally the information that their broker obtained from Morgan Keegan.

Morgan Keegan filed suit in the district court seeking, among other things, an injunction prohibiting the defendants from pursuing their FINRA arbitration claim. Morgan Keegan alleged that it was not required to submit to arbitration under Rule 12200, because the defendants were not Morgan Keegan's "customers" asserting a dispute arising from its business activities.

The district court granted Morgan Keegan's request for a preliminary injunction. *Morgan Keegan & Co., Inc. v. Louise Silverman Trust*, No. JFM-11-2533, 2012 U.S. Dist. LEXIS 3870 (D. Md. Jan. 12, 2012). In addressing the issue whether Morgan Keegan was likely to succeed on the merits, the district court determined that the defendants did not qualify as

---

[4]The defendants asserted claims of fraud, negligent misrepresentation, negligence, failure of supervision, vicarious liability, and violations of both the Tennessee Securities Act of 1980, Tenn. Code § 48-2-122(a), and the Tennessee Consumer Protection Act of 1977, Tenn. Code § 47-18-101, et seq.

"customers," within the meaning of that term in Rule 12200, because there was "no evidence of any relationship at all between the parties or representatives of the parties."[5] *Id.* at *13. The district court ultimately entered final judgment on the same basis, permanently enjoining the defendants from pursuing their FINRA arbitration claim. The defendants timely filed the present appeal.

## II.

On appeal, the defendants argue that the district court erred in enjoining the arbitration proceedings because, under Rule 12200, the defendants were "customers" of Morgan Keegan engaged in a dispute arising from Morgan Keegan's conduct of its business activities. We review this question de novo.[6]

---

[5]In evaluating Morgan Keegan's request for a preliminary injunction, the district court applied the factors set forth in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), and, in addition to evaluating the likelihood of success on the merits, held that the harm Morgan Keegan would suffer in the absence of an injunction would be irreparable, that the balance of equities favored Morgan Keegan, and that, to the extent the public interest was impacted in this case, that factor also weighed in Morgan Keegan's favor. *Louise Silverman Trust*, 2012 U.S. Dist. LEXIS 3870, at *14-21.

[6]We recognize that the defendants, relying on *Washington Square Securities, Inc. v. Aune*, 385 F.3d 432 (4th Cir. 2004), contend that the federal policy favoring arbitration is applicable to the question whether they are "customers" of Morgan Keegan. *See AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011) (discussing presumption). However, their argument is foreclosed by our recent decision in *UBS Financial Services, Inc. v. Carilion Clinic*, No. 12-2066, ___ F.3d ___, (4th Cir. Jan. 23, 2013). There, we distinguished *Washington Square* and explained that the question whether an entity "requesting arbitration is a customer [under Rule 12200] must be resolved to determine the existence of a contract to arbitrate, not the scope of an arbitration agreement." *Carilion Clinic*, slip op. 7-8 n.2. Accordingly, pursuant to our holding in *Carilion Clinic*, we address the present question regarding a customer relationship as a matter of contract law, without considering the federal presumption in favor of arbitration. *Id.*

*UBS Fin. Servs., Inc. v. Carilion Clinic*, No. 12-2066, ___ F.3d ___, slip op. at 7-8 n.2 (4th Cir. Jan. 23, 2013).

In asserting that they have a customer relationship with Morgan Keegan, the defendants primarily contend that the FINRA Code provides a complete definition of the term "customer," by stating in Rule 12100(i) that, unless otherwise defined in the Code, a "customer shall not include a broker or dealer." According to the defendants, this broad definition of "customer" applies to Rule 12200, because that Rule does not provide an alternate definition of the term, in contrast to two other FINRA rules, which define the term in a more specific manner applicable only to those rules. *See* FINRA Rules 2261, 4210(a)(3). Therefore, the defendants contend that they are "customers" of Morgan Keegan under the description of the term provided in Rule 12100(i), because the defendants are not brokers or dealers.

The defendants further assert that the scope of the term "customer" is limited only by the language of Rule 12200, which requires that arbitrable disputes arise from "the business activities of the [FINRA] member." The defendants contend that the term "business activities" necessarily includes conduct by a FINRA member that violates FINRA's Rules, such as Morgan Keegan's alleged misconduct in manipulating the value of funds and in negligently marketing those funds. Thus, the defendants maintain that because their financial losses are traceable to Morgan Keegan's alleged misconduct, the defendants qualify as "customers" of Morgan Keegan, within the meaning of Rule 12200, and are entitled to pursue their FINRA arbitration claim against Morgan Keegan. We disagree with the defendants' arguments.

After the parties presented oral argument in this case, we issued an opinion in *UBS Financial Services, Inc. v. Carilion Clinic*, which addressed the meaning of the term "customer" as used in Rule 12200. In that case, we considered whether an issuer of bonds was a "customer" of two FINRA members,

who had entered into agreements with the bond issuer to assist in the structuring and financing of those bonds. *Carilion Clinic*, slip op. at 2-5. The FINRA members asserted that the bond issuer was not a "customer" under Rule 12200, because the issuer did not have a brokerage or investment relationship with the members. *Id.* at 6-7. Although we rejected this narrow view of the term advocated by the FINRA members, we nevertheless declined to adopt the broad scope of the term "customer" advanced by the defendants in the present case.

We began our analysis in *Carilion Clinic* by addressing the language in Rule 12100(i) that describes the term "customer." *Id.* at 8-9. Contrary to the defendants' position here, we observed that Rule 12100(i) does not provide a comprehensive definition of the term, but simply limits the scope of the term by stating, "[A] customer shall not include a broker or dealer." *Id.*

We also observed that the meaning of the term "customer" is informed by the context of Rule 12200, which requires that arbitrable disputes arise in connection with the FINRA member's "business activities." *Id.* at 9. Thus, we determined that an entity requesting arbitration "must be a customer with respect to a FINRA member's business activities." *Id.*

To determine the scope of such related business activities, we examined relevant language in the FINRA Rules and in FINRA's mission statement. *Id.* at 9-10. We observed that Rule 12100(r)[7] suggests that "business activities" involve the

---

[7]FINRA Rule 12100(r) provides:

The term "person associated with a member" means:

(1) A natural person who is registered or has applied for registration under the Rules of FINRA; or

(2) A sole proprietor, partner, officer, director, or branch manager of a member, or other natural person occupying a similar status or performing similar functions, *or a natural person*

"investment banking or securities business," and that such entities are the subject of FINRA's regulatory mission. *Carilion Clinic*, at 9-10 (citing Restated Certificate of Incorporation of Financial Industry Regulatory Authority, Inc. § 3 (July 2, 2010)). Therefore, we concluded from these sources that the term "business activities" under Rule 12200 refers to investment banking and the securities business. *Id.*

We also considered the ordinary meaning of the term "customer" as being "one that purchases a commodity or service." *Id.* at 10 (citing *Merriam-Webster's Collegiate Dictionary* 308 (11th ed. 2007)). Relying on this definition, as well as the other sources stated above, we concluded that the term "customer" in Rule 12200 refers to an entity that is "not a broker or dealer, who purchases commodities or services from a FINRA member in the course of the member's business activities," namely, "the activities of investment banking and the securities business." *Id.* We further observed that this definition comports with the decisions of other courts that have addressed the meaning of the term "customer" under Rule 12200. *Id.* (citing *UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc.*, 660 F.3d 643, 648-53 (2d Cir. 2011); *UBS Fin. Servs. Inc. v. City of Pasadena*, No. CV 12-05019-RGK (JCx), 2012 WL 3132949, at *4-5 (C.D. Cal. July 31, 2012); *J.P. Morgan Sec. Inc. v. La. Citizens Prop. Ins. Corp.*, 712 F. Supp. 2d 70, 77-79 (S.D.N.Y. 2010)).

In applying this definition to the facts presented in *Carilion Clinic*, we determined that the relationship between the bond issuer and the FINRA members was multifaceted. *Carilion Clinic*, at 14. Under the parties' numerous agreements, the

---

*engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by a member*, whether or not any such person is registered or exempt from registration with FINRA under the By-Laws or the Rules of FINRA. (Emphasis added.)

FINRA members offered financial advice, served as underwriters, worked as lead broker-dealers of the issuer's bond auctions, acted as the issuer's agents in many respects, and rendered other services related to the securities business. *Id.* In exchange for these services, the FINRA members earned compensation in the form of fees and discounts. *Id.* Therefore, we had ample bases on which to conclude that the bond issuer had purchased services from the two FINRA members involving their investment banking and securities business activities and, thus, that the issuer was a "customer" within the meaning of Rule 12200. *Id.* at 18-19.

The facts in the current case, however, differ significantly from the facts presented in *Carilion Clinic*. Here, the defendants did not have a contractual relationship with Morgan Keegan, and did not purchase from Morgan Keegan services or commodities, related to investment banking or the securities business. Instead, the defendants purchased shares of the funds from a third party, through the defendants' brokerage firm, Legg Mason, which was not an "associated person" of Morgan Keegan.

The defendants did not achieve "customer" status with Morgan Keegan as a result of either their Legg Mason broker's interaction with representatives of Morgan Keegan, or that broker's review of Morgan Keegan's written materials describing the funds. While this conduct may have related to Morgan Keegan's securities business, such contact between Morgan Keegan and Legg Mason did not transform the defendants, who merely purchased shares of the funds through Legg Mason, into the role of a "customer" of Morgan Keegan. *See Bensadoun v. Jobe-Riat*, 316 F.3d 171, 177 (2d Cir. 2003) (considering the NASD Rules and requiring a business relationship with a NASD broker for an investor to qualify as a "customer," noting that otherwise, "every purchaser of shares in a mutual fund . . . would arguably be 'customers' of every investment institution with which those funds did business").

We find equally untenable the defendants' argument that they have a customer relationship with Morgan Keegan based on Morgan Keegan's alleged violation of the FINRA Rules and the "connection" between that alleged violation and the defendants' financial losses. The defendants cannot satisfy the common understanding of the term "customer," namely, of "one who purchases a commodity or service," by alleging merely a remote association with alleged misconduct falling within the general ambit of FINRA's regulatory interests.[8] Accordingly, we hold that, under the facts presented, the defendants were not "customers" of Morgan Keegan as contemplated by Rule 12200, because the defendants did not purchase commodities or services from Morgan Keegan in the course of its business activities regulated by FINRA. *See Carilion Clinic*, at 14.

### III.

In sum, we conclude that the defendants were not "customers" of Morgan Keegan under Rule 12200 and, therefore, were not entitled to initiate arbitration proceedings under the mandatory arbitration provision contained in that Rule. Accordingly, we affirm the district court's judgment permanently enjoining the defendants from pursuing their FINRA arbitration claim against Morgan Keegan.

*AFFIRMED*

---

[8]We also are not persuaded by the defendants' reliance on the requirement imposed by FINRA's predecessor organizations that "all disputes arising out of the business activities of a member [ ] be arbitrated." This argument fails in light of the plain language of Rule 12200 requiring a customer relationship. We likewise reject the defendants' reliance on a letter issued by the Director of FINRA in a separate FINRA proceeding. That document is not relevant to the present case and is not entitled to any deference by this Court.